The judgment of the United States Customs Court is accordingly *reversed*.

UNITED STATES *v.* EURASIA IMPORT CO., INC. (No. 4511) [1]

---

[1] C. A. D. 326.

United States Court of Customs and Patent Appeals, January 4, 1946

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.
*James W. Bevans* for appellee.

[Oral argument October 4, 1945, by Mr. Weeks and Mr. Bevans]

Before Garrett, Presiding Judge, and Bland, Hatfield, Jackson, and O'Connell, Associate Judges

Garrett, Presiding Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court (Second Division), one judge dissenting, rendered in reappraisement proceedings, involving the dutiable value of certain dyed cotton velveteens exported from Japan to the United States during the year 1939 and entered at the port of New York.

Two reappraisements, 148616–A and 148653–A, are involved. 148616–A covers five invoices, consulated July 5, 1939, entry being made August 1, 1939. 148653–A covers two invoices consulated June 21, 1939, with entry August 8, 1939.

The issues respecting the dutiable values of the merchandise involved in both reappraisements are substantially the same and the cases were, in effect, consolidated for trial below, a single judgment being rendered. The appeal is from such single judgment and will be treated accordingly.

Two qualities, or grades, of cotton velveteens were imported designated, respectively, as quality No. 100 and quality No. 200. It appears that velveteens are usually cut into thirty-yard lengths but that some of those of quality No. 100 here involved had been cut into fifteen-yard lengths and in making entry the importer took this fact into consideration. It entered the thirty-yard pieces of quality No. 100 at .375 yen per yard, net, packed, and the fifteen-yard pieces at .380 yen per yard, net, packed. All of quality No. 200 was entered at .485 yen per yard, net, packed. The local appraiser advanced the valuation of all of quality No. 100 to .465 yen per yard and that of quality No. 200 to .570 yen per yard, and the importer (proceeding under the provisions of section 501 of the Tariff Act of 1930 as amended by section 16 (b) of the Customs Administrative Act of 1938) appealed to the Customs Court for reappraisement.

In conformity with the provisions of those acts the appeal for reappraisement was referred to, and tried by, a single judge who held

that "the values found by the appraiser have not been proved to be incorrect," and made appraisal sustaining such values.

The importer entered a motion for rehearing which was denied and thereafter it appealed for review to the Customs Court. The appeal was assigned to the Second Division, the majority of which made appraisal as hereinafter quoted.

In accordance with the majority holding the judgment of the single judge (referred to as the trial court) was reversed and the case "remanded to the trial court for further proceedings not inconsistent with the views herein expressed."

A petition for rehearing was filed on behalf of the Government and denied. The instant appeal to this court followed.

It appears that during the period when the exportations took place sales of the types of merchandise here involved for domestic consumption in Japan were not permitted, in consequence of which, it is conceded and has been throughout the proceeding, no question of foreign value is involved in the case. Also, it is (and all along has been) conceded that the correct basis of dutiable value is the export value as defined in section 402 (d) of the Tariff Act of 1930, reading:

(d) Export Value.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings° of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

It is deemed pertinent to state, at this point, certain propositions of law applicable to the jurisdiction and practice of the courts *in reappraisement proceedings.*

(1) No appeal may be taken to this court in reappraisement proceedings except upon a question or questions of law. Such is the provision of the statute as expressed in the last sentence of section 501 of the Tariff Act of 1930, reading:

The decision of the United States Customs Court shall be final and conclusive upon all parties unless an appeal shall be taken by either party to the Court of Customs and Patent Appeals *upon a question or questions of law only* within the time and in the manner provided by section 198 of the Judicial Code, as amended [italics supplied].

(2) This court is bound by findings of fact made by the particular appellate division of the Customs Court from which appeal to us is taken if there be any substantial evidence to support such findings.

(3) The question of whether there is any substantial evidence to support findings of fact is a question of law and, where the question is

raised by a proper assignment of error, it becomes our duty to determine it.

(4) This court does not pass upon the credibility of witnesses nor does it weigh the evidence in case of conflict, those being matters the determination of which is committed exclusively to the tribunals of the Customs Court.

(5) In cases where the single judge sitting for the purpose of appraisal makes findings of fact from which the appellate division differs this court does not assume the authority to determine which was right, but accepts the findings of the appellate division without questioning them unless it be assigned as error that there is no substantial evidence to support them.

The foregoing statements of well-known principles of law and practices thereunder have been set forth because of (1) the state of the record here before us, (2) the assignment of errors, (3) the arguments made in the briefs and orally on behalf of the respective parties, and (4) *particularly* because of the texts of the respective decisions of (a) the single judge and (b) the appellate division.

In our study of the decisions of the respective tribunals below we have found it difficult to separate their findings of fact from their conclusions of law. The decision of the appellate division is so worded that it is impossible to understand it, or obtain a correct idea of the facts found, without considering the decision of the single judge in connection with it. In other words, in order to determine just what facts were found by the appellate tribunal its decision and that of the single judge have to be read together.

The case has what may be designated as a "background," which, as we view the issues, must be taken into consideration. This background in not set forth in the decision of the appellate division, but is stated in the decision of the single judge from which we quote the following:

It appears that part of the difference between the entered and appraised values is to be found in two disputed items, one of a commission charged by the shipper of the merchandise, and the other a so-called export control fee. In disposing of the issue, I find it necessary to set forth certain facts which appear in the record, and which are not apparently disputed, surrounding the exportation from Japan of merchandise such as that involved at the time in question.

Some time in 1936 American manufacturers of cotton velveteen sought an increase in the rate of duty applicable to such merchandise, or to make it dutiable on the basis of American selling price, which is defined in section 402 (g) of the tariff act aforesaid. In order to avoid such an event, it was agreed between representatives of such manufacturers and an association which represented the Japanese manufacturers and exporters to limit the amount of velveteen which might be exported from Japan to the United States in 1 year to 2,000,000 square yards. The term of the agreement was later extended, and it was in force at the time of exportation of the merchandise here involved.

In administering control of the export quantities of velveteen a quota system was set up by the Japan Cotton Yard and Piece Goods Exporters Association for America whereby 80 per centum of the 2,000,000 square yards was allocated to

members of the association in proportion to the actual quantity of shipments made in the preceding year, while the remaining 20 per centum was allocated to the members of the association by auction.

It appears that the association mentioned above was a semi-official organization, operating under the auspices of the Japanese Government. It also appears that it was one of eight exporters' associations, the other seven being formed to operate with respect to exportation of such goods to various other countries. From April of 1939 it appears that a correlated organization, known as the Export Velveteen and Corduroy Manufacturing Co., Ltd., was in operation to control the manufacture of such goods. A report of an acting Treasury attaché which is in evidence as exhibit 18, indicates that all manufacturers and dealers in velveteen goods could sell for export only to members who belonged to one or the other of the eight exporters' associations referred to above.

It should be stated that there is a paragraph in the report, exhibit 18, purporting to be a quotation from a letter received by the Treasury attaché from an official of the Export Velveteen and Corduroy Manufacturing Co., Ltd., which reads as follows:

*Direct purchase by U. S. importers.*

From the standpoint of the pertinent ordinances or the control regulations of the association, there is nothing to prevent (importers from placing orders directly with dealers). However, from a practical standpoint, dealers are not acquainted with export procedure, cabling, etc., and they may not be able to handle direct business with the importers.

This seems to be at variance with the facts, as outlined above, that manufacturers and dealers could sell for export only to members of the exporters' associations. However, there does not appear to be any dispute that no velveteens could be exported from Japan to the United States except against the various allotments of the quotas held by members of the exporters' associations.

In order to defray the costs of administration of the exporters association, a so-called control fee, consisting of a charge of 1 sen 11 rin, or 0.0111 yen, per yard, was collected on all merchandise exported to the United States.

In the case at bar it appears that the exporter, A. Cameron & Co., Ltd., of Kobe, Japan, was holder of an allotment under the quota system. It is contended by the plaintiff, however, that in the transactions here involved Cameron acted as buying agent for the plaintiff and not as seller of the merchandise, and that the export value of the merchandise was the price at which such merchandise was offered for sale by the manufacturers, which, it is claimed, in each case equalled the invoice price less, among other things, the export control fee and the buying commission.

Elsewhere in his decision the single judge stated that the so-called "buying commission" charge in the case at bar was 4 per centum. This appears in a paragraph which reads as follows:

It is interesting to note that plaintiff's single witness, Jacob E. Parks, who stated he was in charge of all purchases for the plaintiff, testified that on May 5, 1939, an order was placed with Fujisaki Bros., a Japanese firm, for velveteen apparently similar to quality No. 100 on which a price of 18½ cents c. i. f. New York was paid. Deducting the charges for freight, insurance, cartage, petty expenses, consular fee, quota fee, quota auction fee, and buying commission, all of which were claimed to be nondutiable and the amounts of which were not stated, Mr. Parks said that that price was equal to a cost of the merchandise of 37 sen per yard, or .37 yen, net, packed. However, it appears, by the calculations of the examiner who passed the merchandise in question, and who testified at the trial on behalf of the defendant, that a c. i. f. New York price of 15½ cents per yard for the same quality of merchandise was the equivalent of an f. o. b. Kobe price

of .465 yen, net, packed, including the quota fees and buying commission. Unless the buying commission was more than the 4 per centum which the record shows was charged in the case at bar, or the other charges were greater, there is no explanation for the comparatively large difference between these prices.

From the above and other parts of the decision of the single judge, we deduce that it was his view that the buyers' commission of 4 per centum and the export control fee amounting to 0.0111 yen per yard, were included in the appraised value found by the local appraiser and that, as a matter of law, their inclusion was proper.

In the final analysis, however, the decision of the single judge rested upon the basis that the importer had failed to overcome the statutory presumption of correctness attaching to the value stated by the appraiser, he saying, *inter alia:*

> After carefully reviewing the entire record I am satisfied that the plaintiff has not established export values for the merchandise other than the values found by the appraiser.

The majority of the appellate division took a different view and held (quoting literally certain of the evidence) that "the items of commission and control fee *did not enter into the difference* between the entered and appraised values of the instant merchandise" [italics ours]; that the merchandise was appraised upon the basis of values found by the appraiser respecting merchandise imported by another importer; that any presumption of correctness attaching to the finding of value by the local appraiser was definitely destroyed, and that the dutiable values were as hereinafter stated.

In an early part of its decision the appellate tribunal quoted the following from the decision of the single judge:

> It appears that part of the difference between the entered and appraised values is to be found in two disputed items, one of a commission charged by the shipper of the merchandise, and the other a so-called export control fee

and commented thereon as follows:

> While the above-quoted statement *may be factually correct*, it definitely appears from the record that the items of commission and control fee were given no consideration when the appraised values were advanced over the entered values. [Italics ours.]

As best we can determine from the decision of the single judge, he, in effect, declined to give any weight to the examiner's testimony, holding that appraisal is legally the function of the appraiser—not of the examiner. His comment was:

> During the course of the presentation of defendant's [the Government's] case the examiner of merchandise who examined and inspected the merchandise in issue was called to the stand and questioned as to the basis of the values which he recommended to the appraiser in connection with the appraisement of such merchandise.
>
> If the purpose of the defendant in so doing was to rebut the evidence offered by the plaintiff by going forward and establishing the export value of the goods as defined by the statute, I am satisfied that it fell short of accomplishing that

purpose. If the purpose was to establish the correctness of the appraiser's action, I am satisfied that it failed in that regard also. However, I do not deem it necessary to enter into a detailed discussion of the action of the examiner. It is sufficient to note that the examiner does not appraise the merchandise; that is the function of the appraiser, according to the provisions of section 500 of the Tariff Act of 1930. How the recommendations of the examiner influenced the appraiser in reaching the conclusion he did does not appear in the record.

Near the conclusion of its decision the majority of the appellate tribunal, after having quoted and paraphrased much of the evidence, said:

Since it appears that the appraiser based his appraisement of the instant merchandise upon the prices of similar merchandise exported from Mitsui of Kobe to Mitsui of New York without giving any consideration to the items of purchasing commission and control fee, and since all the transactions reported by the special agent in exhibit No. 18 make no reference to the items of commissions or control fee, it is our view that this question is not before us in this case. Had the appraiser added the items of purchasing commission and control fee as dutiable items in arriving at his appraised value, and the importer contended these two items were nondutiable, or that the dutiable export value was the appraised value less these items, then a different question would be presented.

The dissenting judge of the division said, *inter alia;*

Aside from any other consideration, there has been an utter failure on the part of the importer to establish the exact status of the so-called commission, and export control fee, in relation to the market value of the merchandise. I do not, of course, accede to the view of the majority that such items are not before the court for consideration.

The majority's specific finding of dutiable value reads:

From our review of the record, we feel that it shows an export value for quality No. 100 of .38 yen, packed ex Kobe, and for quality No. 200 of .495 yen, packed ex Kobe, which, as we understand, is equivalent to the entered values, except as to those items which were cut into 15-yard lengths and for which cutting there was an extra charge of ½ sen. This extra charge of ½ sen per yard should, of course, be added to the value of those items which were cut from 30-yard lengths to 15-yard lengths.

It will be observed that the majority's finding constituted a slight advance over the values entered by the importer. As stated in an early part of this opinion, the importer entered the thirty-yard lengths of quality No. 100 at .375 yen per yard and the fifteen-yard lengths at .380 yen per yard, while the majority of the appellate division found the value of the thirty-yard lengths to be .38 yen per yard and, in effect, directed an addition to the .38 yen of ½ sen on such of the materials as had been cut to fifteen-yard lengths. So far as the materials of quality No. 200 are concerned, apparently they were all in thirty-yard lengths, but if any of those were cut into fifteen-yard lengths such lengths would, under the majority decision, be subject to the ½ sen additional.

Counsel for the importer has not challenged before us the values so found by the majority.

. Our principal difficulty in the case, which is a complex one, has been in interpreting the majority's holding with respect to the items of so-called buyer's commission and so-called export control fee. Taking its decision as a whole, the majority's position seems to be that the local appraiser did not "consider" the items in advancing the value (this view apparently being based, in part at least, upon the testimony of the examiner concerning his recommendations to the appraiser) and hence the majority would not consider them.

It seems apparent from the course pursued by counsel for the Government that they were of opinion that the importer had established a *prima facie* case sufficient to overcome the correctness of the appraiser's valuation, because counsel proceeded, at the conclusion of the importer's presentation of evidence, to introduce testimony and documentary evidence. Counsel for the Government, however, did not call the appraiser who officially made the appraisement but called the examiner whose official duty was merely to make recommendations of dutiable values. The appraiser was not bound by such recommendations. If counsel for the Government felt that the importer had established a *prima facie* case, it would seem to have been logical procedure for counsel to call the appraiser, and have him explain the reasons for his advancement of values.

As was correctly stated in the decision of the single judge "* * · * the examiner does not appraise the merchandise; that is the function of the appraiser * * * ."

It seems apparent from the decision of the majority of the appellate division that it treated the testimony of the examiner as though it had been the testimony of the appraiser, and this, perhaps, accounts in part for its conclusion that the items of commission and export control fee were not "considered" by the appraiser. Of course, the fact that the examiner did not affirmatively state that the items were considered in his recommendation does not constitute any substantial evidence that the appraiser did not consider them.

The case appears to have been presented before both the single judge and the appellate division—and certainly it was presented before us—by counsel for both parties upon the theory that the appraiser did include and consider those items. Most of the argument before us was directed to the question of whether they constituted proper elements, in determining export value. Counsel for the importer conceded, and has all along conceded, that it paid them, but contends, and has continuously contended, that they are not items which should enter into dutiable value.

It is our view that under the record presented, the majority of the appellate division erred in refusing to give consideration to the items in question. Whatever may have been the attitude of the local appraiser with respect to them, the final decision as to appraisal, so far as findings of fact are concerned, rested with the appellate division.

It is not a question of whether the local appraiser included them or considered them. The appellate division should consider them and declare whether or not, under the facts it may find respecting their payment and status, both or either of the items constitute a part of export (and, therefore, dutiable) value, as defined in section 402 (d), *supra*.

To the end that the necessary findings upon the points suggested may be made, the judgment is *reversed* and the cause *remanded* to the appellate division for its further consideration and action.

STATEMENT ON PETITION FOR REHEARING

GARRETT, Presiding Judge.

The decision in this case was rendered January 4, 1946. On January 23, 1946, counsel for the Government filed a petition for rehearing in which clarification of our decision upon certain points is requested.

The petition is granted for that purpose.

It appears that the terms of the remand as conveyed to the Customs Court read:

Ordered that the judgment of the United States Customs Court be, and the same is hereby, reversed, and said cause is remanded to said court with instructions to the appellate division to consider the items of commission and export control [fee], and declare whether or not, under the facts it may find respecting their payment and status, both or either of the items constitute a part of export (and, therefore, dutiable) value, as defined in section 402 (d).

Concerning this the petition states:

This may be construed by the Appellate Division of the Customs Court as limiting the scope of its reconsideration to the one question whether these two items are dutiable or non-dutiable. The next inquiry will be the basic prices to which or from which these items are to be added or deducted, as the case may be.

The following finding of fact by the appellate division (which was quoted in our original decision) is then quoted:

From our review of the record, we feel that it shows an export value for quality No. 100 of .38 yen, packed ex Kobe, and for quality No. 200 of .495 yen, packed ex Kobe, which, as we understand, is equivalent to the entered values, except as to those items which were cut into 15-yard lengths and for which cutting there was an extra charge of ½ sen. This extra charge of ½ sen per yard should, of course, be added to the value of those items which were cut from 30-yard lengths to 15-yard lengths.

Following this the petition states:

The opinion of this court does not indicate whether it affirmed this finding of fact subject to the qualification that the items of commission and control fee should be added, in order to make dutiable value, depending upon the facts the Appellate Division may find respecting their payment and status. On the other hand, the opinion does not indicate whether or not this court determined that this finding of fact was not supported by substantial evidence, and that it could, therefore, not receive this court's approval. If this court intended to

affirm this finding as properly representing the basic price above-referred to, the Appellate Division of the Customs Court would then know with certainty that the only matter to be considered by it will be the dutiablity of these two items.

After suggesting, in effect, that certain language used in our decision might indicate that it was not our intention that the appellate division should be confined to the consideration of only the items of commission and export control fee in determining what is designated as "basic prices," the petition concludes:

If the court has reached a conclusion with regard to the basic prices, which its opinion and its remand has not specifically expressed, it is suggested that in the interest of terminating this litigation with expedition and to obviate the necessity of further review, the conclusion of the case will be aided by this court expressing such conclusion, and the Customs Court and the parties may with certainty conduct their further proceedings.

It will be seen from our original decision that we pointed out that in its finding therein quoted and herein repeated, the appellate division made a slight advance over the entered values, and that such advance was not challenged by the importer.

It was our purpose to approve this finding and we do now approve and affirm it, subject to the qualification that the appellate division should consider the items of commission and control fee and declare, upon the facts it may find from the record concerning them, whether or not they should be added to the values stated in the finding quoted.